OPINION OF THE COURT
Phyllis Orlikoff Flug, J.
This action for a divorce was commenced by the plaintiff on September 25, 1990. The complaint alleges that the defendant acted in a cruel and inhuman manner in that she, inter alia: “conspired with physicians at the Mount Sinai Fertility Clinic to secretly use eggs donated by an unknown woman, instead of defendant’s own eggs, and mixing sperm donated by an unknown man with plaintiffs sperm to artificially fertilize said donor eggs through a process known as ‘in vitro fertilization’.” (Complaint seventh. 1.)
The plaintiff claimed that the defendant then had the fertilized eggs implanted in her body, thereby becoming pregnant (with twins). Two daughters, Amanda and Alexandra, were born to the defendant on February 3, 1991.
The plaintiff alleges that he never consented to the use of a donor egg nor donor sperm in this process.
Issue was joined by service of an answer on October 15, 1990.
Thereafter, the plaintiff learned through DNA evidence that he was the true father of the children.
On June 10, 1991 the plaintiff moved: (a) for “immediate and sole custody” of the twins; and (b) to direct amendment of the birth certificates of the children to state that he is their biological father and to change their surnames from the defendant wife’s maiden name, Benitez, to McDonald.
Justice Angelo Graci of this court by an order dated June 10, 1991 denied that branch of the father’s motion seeking custody *213 and granted defendant’s cross motion for temporary custody of the children.
On February 22, 1994 the Appellate Division, Second Department, in a lengthy opinion, established the defendant wife as the gestational (but not the genetic) mother of the twins. The court noted that the action for divorce commenced by the husband sought, inter alia, a declaration that the children “ ‘be declared illegitimate * * * or, in the alternative, should such children be found to be genetically and legally plaintiffs, that custody be granted to plaintiff.” (McDonald v McDonald, 196 AD2d 7, 9.)
In analyzing the unique factual pattern, the appellate court affirmed the trial court’s finding that in the “instant ‘egg donation’ case”, the gestational mother is the natural mother and was, therefore, entitled to temporary custody of the children. (McDonald v McDonald, supra, at 12.) The plaintiffs allegations regarding his wife’s misconduct in securing his consent to the in vitro fertilization were left to be “fully explored before a final custody determination is made.” (Supra.) In addition, based on the genetic testing, which indicated that the plaintiff was indeed the father of the children, his motion to amend the birth certificates should have been granted by Justice Graci.
An amended answer and counterclaim alleging, inter alia, adultery by the plaintiff was served on September 29, 1997.
On February 4, 1998 plaintiff filed a note of issue.
Before the trial began, the plaintiff served subpoenas on Benjamin Sandler, M.D., one of the physicians at the Infertility Clinic, to secure his testimony at trial, as well as on the clinic for the records involving the defendant’s treatment.
The doctor and clinic, claiming physician-patient privilege, declined to honor the subpoenas.
CPLR 4504 in pertinent part provides: “(a) Confidential information privileged. Unless the patient waives the privilege, a person authorized to practice medicine * * * shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.”
The defendant has not and does not waive the privilege. It is this court’s considered opinion that: (a) all of the communications between the defendant and her physicians pertained to the defendant’s condition and were necessary for her treatment; and (b) the plaintiff was never the patient of the doctors at the clinic. He dealt only with the defendant who not only *214 transmitted all documents personally, but the plaintiffs sperm as well.
The court finds: (1) the plaintiff does not qualify as a “subject” pursuant to Public Health Law § 18 (1) (h), and (2) that there was no waiver of the privilege as urged by the plaintiff.
In the alternative, the plaintiff argued that Dr. Sandler should be compelled to be examined regarding a statement he allegedly made to the plaintiff against his interest.
A declaration against interest may be received if four conditions are satisfied: (1) the declarant is unavailable; (2) the declaration when made was against the pecuniary, proprietary or penal interest of the declarant; (3) the declarant had competent knowledge of the facts; and (4) there was no probable motive to misrepresent the facts. (Basile v Huntington Utils. Fuel Corp., 60 AD2d 616 [2d Dept 1977].)
Here, there is no evidence to suggest that the doctor participated in any fraud regarding the forged signature. Although he certainly had knowledge of the treatment being given the defendant, there is no evidence to even suggest that he aided, abetted, encouraged or directed defendant in said forgery. Plaintiffs allegations are pure conjecture. Thus, his argument fails to meet the required conditions and, accordingly, the court adheres to its original decision not to allow the doctor’s testimony.
This court conducted a 10-day trial on the issue of fault, beginning on May 6, 1998 and concluding on July 29, 1998. In addition to the plaintiff and defendant, John Marotta, Esq., Law Guardian for the infant issue, participated at the trial.
Based on all the testimony, the court makes the following findings of fact and reaches the following conclusions of law:
The parties were married on July 9, 1988. At the time of the marriage the defendant told the plaintiff, who was then 31, that she was three years older than he, when in reality she was 36 years of age. Also, at that time, both parties were medical doctors; however, plaintiff lost his license as a result of a Federal criminal proceeding. The defendant continues to practice medicine.
The parties were desirous of having a child, but were having difficulty in achieving this end.
The defendant eventually went to the Mt. Sinai Infertility Clinic and saw Dr. Benjamin Sandler, seeking help in an in vitro fertilization procedure.
*215 The defendant testified that prior to the last procedure, the plaintiff told her to do whatever she wanted to do (to become pregnant).
On April 22, 1990, while at their jointly owned office in Jackson Heights, the plaintiff provided the defendant with two sperm samples for delivery to the fertility clinic. One was provided in the morning and the second later that afternoon. The parties agreed in their testimony that a document termed a “consent” (authorizing a procedure of in vitro fertilization) was signed by the plaintiff, who further testified that he did not read the document before signing; and an “authorization” was signed by the defendant, who testified that she, likewise, did not read it. That document was not admitted into evidence. However, another document purporting to be a “consent” or “authorization” by the plaintiff was, admittedly, signed by the defendant and submitted to the clinic by her in May 1990.
The defendant became pregnant in and about May 1990 as a result of the in vitro fertilization, and her twin daughters were bom in February 1991.
The defendant, called by the plaintiff as his witness, testified that the parties separated on July 9, 1990 “because I became pregnant.” The plaintiff did not refute this allegation.
The plaintiff contends that (a) his sperm and consent for artificial insemination were secured through fraud; (b) that that fraud, standing alone, was so fundamental and detrimental to the parties’ relationship that it amounts to cruel and inhuman treatment; and (c) that that fraud rose to the level of making it unsafe and improper for the plaintiff to continue to reside with the defendant.
It is well recognized that any action for divorce is statutory (Pajak v Pajak, 56 NY2d 394). Plaintiff relies on cruel and inhuman treatment (Domestic Relations Law § 170 [1]), which requires that the defendant’s conduct must so endanger the physical and mental well-being of the plaintiff as to render it unsafe and improper for the plaintiff to cohabit with the defendant. As it liberalized the definition of cruel and inhuman treatment, the courts have consistently distinguished cruel and inhuman treatment from incompatibility. In addition, while objective proof of physical or mental injury could be a decisive basis for a divorce, it is not a prerequisite.
Plaintiff is unable to supply the court with any statutory decisions holding that fraud can establish cruel and inhuman treatment, and further, even if it did, that one occurrence can be of such a degree that it is able to support a cause of action.
*216 Plaintiff has failed to show any of the following: (1) serious physical abuse; (2) threats of violence; (3) intoxication and/or drug abuse; or (4) refusal to engage in sexual relations (see, Scheinkman, New York Law of Domestic Relations §§ 10.2-10.7). At best, plaintiff’s testimony came within the purview of those cases alleging acts of verbal abuse and torment. However, that requirement is linked to verbiage of a serious nature and a pattern of behavior is required (see, Thom v Thom, 162 AD2d 811 [3d Dept 1990]).
At bar, defendant clearly embarked on a barrage of verbal assaults (commonly called nagging) on plaintiff in her quest to bear children; however, that pattern ended before the plaintiffs cause of action in this case. At the point in time that defendant became pregnant, her verbal barrage ended.
The factual pattern is, to say the least, unusual.
In order to establish fraud, the plaintiff must show: (1) a misrepresentation of fact; (2) which is either untrue or known to be untrue or recklessly made; (3) which is offered to deceive the other party; (4) inducing that person to act upon the misrepresentation; (5) to that person’s detriment (see, Brown v Lockwood, 76 AD2d 721).
The court finds that in forging plaintiff’s signature, the defendant “knowingly misrepresented a material fact”. However, said forgery was not done to deceive the plaintiff, nor was it reckless. Further, it in no way induced the plaintiff to act, and finally, the plaintiff did not suffer a detriment, since the plaintiff had given permission to defendant to “do whatever she wanted in order to get pregnant”. He testified that he consented to the procedure for her treatment at the Infertility Clinic. His contention that he consented only to the use of his sperm with the defendant’s eggs is unsupported and unbelievable. Assuming, arguendo, that he did rely upon the misrepresentation, it is quite clear that he has not been injured in the classical way that cases involving fraud have established. Quite the contrary, he has been blessed with twin daughters, whose custody he has been seeking since June 10, 1991.
This court rejects all of the other allegations of the plaintiff offered to establish the cruel and inhuman treatment. Those actions must so endanger “the physical or mental well being of the plaintiff as renders it unsafe or improper for the plaintiff to cohabit with the defendant” (Domestic Relations Law § 170 [1]). However, the plaintiff has conceded the fact that the parties separated on July 9,1990, one day before the complained-of conduct began.
*217 Plaintiffs pleadings and subsequent actions clearly establish to this court that he has sought at various times diametrically opposed consequences as the result of the birth of twins to the defendant. His actions (reinforced by his consultations with his attorney-referred psychologist Steven Barlow, Ph D) show the plaintiff to have been a very angry, upset and anxious individual during the summer of 1990. Stated in simplistic terms, upon learning that his wife was pregnant in July 1990, plaintiff developed a masculinity problem. Instead of seeking to resolve this with his wife, he instead initially turned to an attorney, then to a psychologist, and finally, oh September 25th, to another attorney to cement his conclusion that he “would never take the defendant back”. Before the birth of the children, he shamelessly labeled them as “monsters and freaks”. When it was confirmed that he was indeed the genetic father, he displayed his true colors by doing a 180-degree turn, seeking to legitimatize and obtain custody of them. At the same time, he commenced a separate tort action against his wife, the doctors and the hospital who treated her with regard to her artificial insemination and the eventual birth of the children. That action has been dormant and is still in limbo.
The plaintiffs credibility is seriously diminished as a result not only of the tort action, but his failure to financially support his children, and, based upon the report of the Law Guardian, to substantially and meaningfully include them in his life. The plaintiff admittedly has two illegitimate children who reside with him and his paramour. While the defendant may have been less than candid and forged the plaintiffs name on the consent for artificial insemination without his specific authority, plaintiffs further allegations at trial that there are additional embryos to which he seeks possession, and his failure to litigate his claims against the hospital and doctors, reveal an individual unworthy of belief.
Defendant, on the other hand, has not established herself as having a higher moral standing with regard to her actions in conceiving and bearing the children and in dealing with the plaintiff; however, she has sustained her burden of proof with regard to her counterclaim for divorce based on plaintiffs adultery.
The parties are directed to appear in court on December 4, 1998 to continue the trial on the issues of custody and equitable distribution.